IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SANDRA DEJARNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 2:12-cv-846-MEF |
| v. | ) | (WO – Do Not Publish) |
| | ) | |
| JERRY WILLIS, individually and as Mayor | ) | |
| of the City of Wetumpka; TEX GRIER, | ) | |
| individually and as an employee of the City | ) | |
| of Wetumpka; and CITY OF | ) | |
| WETUMPKA, a municipal corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion for Summary Judgment filed by Defendants Jerry Willis ("Mayor Willis"), Tex Grier ("Grier"), and the City of Wetumpka (the "City") (collectively, "Defendants") on June 14, 2013. (Doc. #13.) Having carefully reviewed the submissions of the parties, the applicable law, and the record as a whole, the Court finds that Defendants' motion is due to be GRANTED.

## I. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the claims in this action under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), and 1367 (supplemental jurisdiction). The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both.

## II.  STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–23.

Once the moving part has met its burden, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a district court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  After the non-moving party has responded to the motion for summary judgment, the district court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to a judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

### III. FACTS

The Court has carefully considered the submissions of the parties in support of and in opposition to the motion.  The submissions of the parties, when viewed in the light most favorable to the non-moving party, establish the following material facts:

**A.     Dejarnett's Employment with the City**

Plaintiff Sandra Dejarnett ("Plaintiff" or "Dejarnett") is an African-American female who was hired to work full-time as Permit Clerk for the City on December 21, 2006.  The Permit Clerk position is a classified position within the Building Department.  As Permit Clerk, Dejarnett issued municipal permits, including building, plumbing, mechanical, and gas/electrical permits, scheduled inspections, and filed inspection results.  Dejarnett had to work with the public on a routine basis, as she was the "contact" person for developers, contractors, and business owners who were seeking to obtain or had questions regarding building inspections and permits in the City.

Dejarnett was the Permit Clerk throughout her employment with the City.  She was

also the only full-time African-American female[1] working in the Administrative Building[2] during that time.  Defendant Grier was the City's Building Inspector and Director of the Building Department and served as Dejarnett's supervisor during the relevant time. Defendant Willis was the City's Mayor[3] and served as its Chief Administrative Officer during the relevant time.

**B.     The City's Discipline Policies**

The City's Personnel Policies Manual sets forth a progressive disciplinary policy, which applies to classified employees.  Employee offenses are divided into two categories: group one and group two offenses.   Group one offenses are defined as "instances of unacceptable conduct by an employee which, while serious, do not normally merit a suspension without pay or dismissal upon the first occurrence, and therefore, may normally be addressed by a lesser degree upon the first occurrence[.]"  (Doc. #13, Ex. 1.)  Examples of group one offenses include, among others, failing to give proper notice of an absence, tardiness, safety violations, and inefficiency.  (Doc. #13, Ex. 1.)  Disciplinary actions normally recommended for a group one offense are: (1) a written warning for the first offense; (2) suspension without pay for the second offense; and (3) termination for the third

---

[1]  Gwynn Turner, another African-American female, also worked in the Administrative Building during Dejarnett's employment but on a part-time basis.

[2]  The City's Administrative Building is essentially City Hall and is where Mayor Willis's office is located.

[3]  Mayor Willis was elected Mayor of the City of Wetumpka in 2008 and continues to hold that office.

offense.  (Doc. #13, Ex. 1.)

Group two offenses, on the other hand, are defined as "instances of unacceptable conduct by an employee which are very serious and constitute grounds for immediate dismissal upon the first occurrence of such conduct unless mitigating circumstances, as determined by the department head, render lesser discipline more appropriate."  (Doc. #13, Ex. 1.)  Examples of group two offenses include, among others, dishonesty, serious leave offenses, abusive conduct, insubordination, and conduct unbecoming an employee.  (Doc. #13, Ex. 1.)  Disciplinary action normally recommended for a group two offense is immediate dismissal unless mitigating circumstances warrant lesser disciplinary action.  (Doc. #13, Ex. 1.)  In other words, progressive step discipline is typically not utilized for group two offenses.

Disciplinary action is administered by the Mayor.  When an employee is due to be discharged, the Mayor is to provide written notification to the employee of his intention to dismiss the employee and that the Mayor will conduct a hearing concerning the allegation against the employee, if the employee requests a hearing in writing.  (Doc. #13, Ex. 1.)  A copy of the notice should be placed in the employee's personnel file.  (Doc. #13, Ex. 1.)  The written notice to the employee should contain the following information: (1) the date, time, and place of the hearing; (2) the reason(s) for the proposed disciplinary action; (3) the proposed disciplinary action to be taken and the effective date; (4) notice of the employee's right to appear in person or be represented by someone at her own expense; (5) notice of the employee's right to respond to the allegations orally or in writing; and (6) the employee's

5

right to present evidence in her defense.  (Doc. #13, Ex. 1.)  The employee has three calendar days in which to respond to the notice and/or request a hearing.  (Doc. #13, Ex. 1.)  The employee must submit a request for a hearing in writing.  (Doc. #13, Ex. 1.)

If the employee requests a hearing, it will be conducted informally by the Mayor at the time and place designated in the notice to the employee.  (Doc. #13, Ex. 1.)  If the Mayor determines after the hearing is complete that the facts of the case support dismissal, the dismissal will become effective on the date specified in the notice.  (Doc. #13, Ex. 1.)  A written notice of dismissal shall be dated, signed by the Mayor, and delivered to the employee no later than the effective date.  (Doc. #13, Ex. 1.)  A record of the completed dismissal action shall be placed in the employee's personnel file.  (Doc. #13, Ex. 1.)

The Mayor has three business days to render a decision following a hearing.  (Doc. #13, Ex. 1.)  The decision must be in writing and contain a summary of the Mayor's findings and the Mayor's decision.  (Doc. #13, Ex. 1.)  The employee has seven calendar days to appeal the Mayor's decision and request a review by the City Council.  (Doc. #13, Ex. 1.) The City Council must then render a decision within three business days of receipt of the appeal, and it may sustain, amend, or overrule any previous decision.  (Doc. #13, Ex. 1.)  A hearing before the City Council is not required.

## C.   Complaints About Dejarnett and her Termination

Grier and Mayor Willis began receiving oral and written complaints about Dejarnett's treatment of customers as early as December 2008.  The written complaints focused on Dejarnett's poor attitude and uncooperativeness with customers during the permit and

inspection process and consist of the following: (1) a December 18, 2008 complaint to Mayor Willis by Frank Bertarelli, a local business owner, about Dejarnett's poor attitude, unhelpfulness, and his concern over an incident during which she called him a "liar;" (2) an April 13, 2010 complaint to Mayor Willis by Paul Pemberton, another local business owner, about Dejarnett's uncooperativeness and that she made every "trip down [to the Building Department] a bad experience;" (3) an April 12, 2011 email complaint[4] to Mayor Willis by Sherry Cox with Alpha Acme Electric, Inc. about Dejarnett's poor attitude during a pole inspection process, saying that she had "never dealt with anyone with such a bad attitude;" (4) an April 18, 2011 citizen email complaint to Grier about Dejarnett's poor "office manners;" and (5) a May 27, 2011 complaint to Grier by Roger Blankenship, a local contractor, about Dejarnett arguing with him and her "indifference, rudeness and hateful attitude" every time he tried to get a job done.  (Doc. #13, Ex. 11.)  Mayor Willis and Grier received several additional complaints about Dejarnett over the phone and in person.

Mayor Willis and Grier both testified that they spoke to Dejarnett about these complaints.  Dejarnett denies ever being counseled by Mayor Willis or Grier, whether verbally or in writing, and there are no written, formal counselings in her personnel file.[5] The parties do not dispute that Dejarnett was never given a written performance evaluation during her employment with the City, which is required under City policy.  (Doc. #13, Ex.

---

[4]  This email memorialized a prior verbal complaint Cox made to Mayor Willis about Dejarnett's rude treatment of her during the pole inspection process.  (Doc. #13, Ex. 10.)

[5]  City policy requires that any written, formal counselings issued to an employee be placed in their personnel file.  (Doc. #13, Ex. 1.)

1.)

It appears that Mayor Willis and Grier believed that Dejarnett's conduct could be handled by simply talking to her. However, when Grier received three written complaints about Dejarnett within a two month time period in the Spring of 2011, he felt that disciplinary action was appropriate. On May 27, 2011, Grier sent a letter to Mayor Willis, wherein he reiterated, based on their previous discussions, that he continues to receive complaints about Dejarnett and recommended that she be terminated based on violations of two group two offenses: (1) abusive conduct and (2) conduct unbecoming an employee.[6] (Doc. #13, Ex. 11.) Grier provided Mayor Willis with no additional documentation substantiating the basis for his recommendation other than what he included in this letter. Under City policy, violations of group two offenses are normally grounds for immediate dismissal. There is no dispute that Dejarnett was never given a formal, written counseling or suspended during her employment with the City.

At some point after Grier's May 27 letter, Dejarnett's employment and proposed termination were discussed with the City attorney. After reviewing a proposed termination letter, the City attorney issued a memorandum to Grier and Mayor Willis that recommended against Dejarnett's termination and noted that, based on the limited information contained in the draft termination letters, Dejarnett's conduct does not appear to have risen to the level

---

[6] The City's Personnel Policies Manual describes abusive conduct as "abusive personal conduct or language toward the public or fellow employees" and conduct unbecoming an employee as "conduct unbecoming an employee, while on or off duty, which tends to bring discredit upon the City[.]" (Doc. #31, Ex. 1.)

of a group two offense, but rather a group one offense, which should be addressed through the City's progressive discipline procedures as opposed to immediate termination.  (Doc. #32, Ex. 5.)

Nevertheless, on June 3, 2011, Grier called Dejarnett into his office, informed her that the City had received several complaints about her, and gave her the option of resigning or being terminated.  Mayor Willis and Janice Whorton[7] ("Whorton") were also present during this meeting.  Dejarnett refused to resign because she did not know why she was being asked to resign.  (Doc. #31, Ex. 2.)  Dejarnett was also provided with a letter dated June 3, 2011, from Mayor Willis, which stated that the City had continued to receive unfavorable comments about her from the public, both in writing and orally, based on her failure to show proper respect, courtesy, and consideration, and that her department head (Grier) had recommended her termination for violating the group two offenses of abusive conduct and conduct unbecoming an employee.  (Doc. #13, Ex. 12.)  Mayor Willis informed Dejarnett in that same letter that, if she desired a hearing, she must submit a written request within three days, and he also informed her of the date, time and location of any requested hearing, that she would have an opportunity to respond to the charges at the hearing, that she would have the right to present evidence in her defense at the hearing, and that she could also be accompanied at the hearing by anyone of her choosing at her own expense.  (Doc. #13, Ex. 12.)  Dejarnett refused to sign Mayor Willis's June 3 letter until she spoke with a lawyer.  At

---

[7] Whorton is the City Clerk and Treasurer.

the meeting, Dejarnett also requested to see her personnel file and the complaints referenced in her June 3 termination letter from Mayor Willis, but Grier would not let her.  (Doc. #13, Ex. 13.)

Dejarnett requested a hearing on her termination by letter dated June 6, 2011.  She also requested a copy of her personnel file.  In this letter, Dejarnett further complained that her termination was wrongful because it "appears to be based on something coming in the future, but nothing on-hand at the time of my termination."  (Doc. #13, Ex. 13.)  In this letter, however, Dejarnett never mentioned her race or that her termination was racially motived.  (Doc. #13, Ex. 13.)  There is also no dispute that Dejarnett never complained about race discrimination during her employment with the City.

On June 15, 2011, Dejarnett's attorney hand-delivered a letter to Mayor Willis in response to Dejarnett's proposed termination in which he claimed that Dejarnett had not been informed of the specifics of the charges against her, such as what abusive conduct or language she engaged in with the public and when.  Dejarnett's attorney further noted that Dejarnett was the only African-American female employed in the City's Administrative Building, that she was the lowest paid employee there, and that she was not interviewed for a vacant position in that department that was ultimately filled by a white female.

On June 15, 2011, Dejarnett's pre-termination hearing was held with Mayor Willis.  Dejarnett attended the hearing with her attorney, but did not speak in her defense.  Indeed, during the hearing, neither Dejarnett nor her attorney refuted the specific instances of misconduct alleged against Dejarnett in the complaints.  Instead, Dejarnett's attorney

10

objected to the recommendation that Dejarnett be terminated on the basis that the City had not followed its own policy and that Dejarnett had not been apprised of the specific factual bases of the complaints against her; therefore, she could not meaningfully respond. (Doc. #13, Ex. 21.) Yet, Dejarnett does not dispute that she received copies of three written complaints against her prior to her pre-termination hearing with Mayor Willis.[8] These complaints, which were referenced in the hearing, were from December 18, 2008, April 12, 2011, and June 6, 2011. Dejarnett noted at the hearing that the June 6, 2011 complaint was received after her June 3, 2011 termination letter from Mayor Willis and that she had not received any prior counselings before her termination.

On June 17, 2011, Mayor Willis notified Dejarnett in writing that he was upholding her termination. Mayor Willis explained in his letter that he reached this decision based on Dejarnett's failure to offer any "rebuttal to the complaints, defense of [her] actions, or alternate versions of [her] encounters with complaining citizens." (Doc. #13, Ex. 14.) Mayor Willis further notified Dejarnett that she had seven days to request that the City Council review his termination decision. (Doc. #13, Ex. 14.)

On June 21, 2011, Dejarnett appealed Mayor Willis's termination decision and requested a review by the City Council. Mayor Willis had Whorton contact each of the Council members directly and inform them that a request for a review had been made.

_____

[8] These complaints were from Zap Pest Control, Alpha Acme, and Mr. Bertarelli. However, the evidence shows that none of the complaints against Dejarnett were ever placed in her personnel file.

11

Whorton then informed Mayor Willis that none of the Council members had requested additional information regarding Dejarnett's termination.  Mayor Willis did not speak with any of the Council members directly about Dejarnett's appeal.  On June 28, 2011, Mayor Willis informed Dejarnett by letter that the City Council had reviewed his decision, no request for additional information had been made, and her termination was final and effective as of that date.  (Doc. #13, Ex. 16.)  However, the City Council never gave Dejarnett a written decision.  Moreover, several individuals who were members of the City Council at that time testified that they did not review Mayor Willis's decision, contrary to his representations in his June 28, 2011 letter to Dejarnett.

On July 14, 2011, Mayor Willis, who was out of town at the time, was contacted by the Council and requested to call a special meeting, which he did.  The special meeting was scheduled for the following day, July 15, 2011; however, when it came time for the meeting to be held, a quorum was not present and the meeting could not continue.  This special meeting was scheduled to reconvene on Monday, July 18, 2011, after the City Council's regularly scheduled meeting.  Dejarnett and her attorney attended this meeting.  However, after the regularly scheduled meeting had ended, a special meeting was not called because Mayor Willis had questions as to its legality and whether it had been properly called.  Given the questions as to the meeting's legality, the City attorney, who was also at the meeting, suggested that the meeting be reconvened at a later time when no issue would exist as to its lawfulness.  However, the City Council did not reconvene over Dejarnett's appeal, as no requests were made to hold another meeting after the July 18 meeting concluded.  The City

12

Council also never reviewed Mayor Willis's decision in an informal setting.

**D.     Procedural History**

On September 26, 2011, Dejarnett filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination against Mayor Willis and Grier, both of whom are white, based on race and color.  Dejarnett makes no claims about gender discrimination.  Moreover, there is no dispute that Dejarnett never complained about race or color discrimination during her employment with the City.  These complaints did not arise until after Dejarnett's termination.  Also, Dejarnett never heard Mayor Willis or Grier say anything she believed was racist or make any statements suggesting that they would make employment decisions based on race.  Dejarnett's main complaints regarding Mayor Willis are that he told her he had "learned to like her" and that he occasionally would not speak to her when he passed her in the hallway, although she could not attribute either action to her race or color.

Dejarnett's charge of discrimination is based on the following: (1) Grier telling her in September 2010 that she could be laid off, which never came to fruition; (2) a white co-worker, Tonja Vreeland, receiving a thirty-day suspension after failing a drug test; (3) Dejarnett being the only full-time black female employee at that City in a department other than the police department; (4) Dejarnett having to eat lunch at 11:00 a.m., while her white co-workers ate lunch at noon; (5) Dejarnett not getting an interview for the Public Works Secretary position, which was filled by a white female; (6) Dejarnett being passed over for a facilities coordinator position, which was filled by a white female; and (7) Mayor Willis

13

not hiring any African-American females since he came into office in 2008, but filling three vacant positions with white females.  (Doc. #32, Ex. 12.)  On February 2, 2012, the EEOC issued a determination finding that race and/or color was a factor in Dejarnett's termination. (Doc. #32, Ex. 13.)

On July 9, 2012, Dejarnett received her right to sue letter from the EEOC.  On October 2, 2012, Dejarnett filed her complaint against Mayor Willis, Grier, and the City, alleging the following claims: (1) discrimination based on race and color against all Defendants in violation of Title VII and 42 U.S.C. § 1981 (Count 1); (2) denial of equal protection under the Fourteenth Amendment in violation of 42 U.S.C. § 1983 against all Defendants (Count II); (3) denial of due process under the Fourteenth Amendment in violation of 42 U.S.C. § 1983 against all Defendants (Count III); and (4) a state law negligent failure to train claim against the City (Count IV).  (Doc. #1.)  Defendants seek summary judgment in their favor on all of Dejarnett's claims.

Unfortunately, while Dejarnett generally states in her complaint that she has sued Mayor Willis and Grier in both their individual and official capacities, she has failed to specify in Counts 1 through 3 what capacity she is suing Mayor Willis and Grier in–their individual or official capacity.  Thus, for purposes of this Memorandum Opinion and Order, the Court will assume that Dejarnett intended to assert Counts 1 through 3 against Mayor Willis and Grier in both their individual and official capacities.

## V.  DISCUSSION

### A.    Official Capacity Claims Against Mayor Willis and Grier

14

As stated above, Dejarnett generally asserts Counts 1 through 3 of her complaint against "Defendants," but never specifies whether those counts are asserted against Mayor Willis and Grier in their official capacities, their individual capacities, or both.  (Doc. #1.)  Thus, the Court will assume that Dejarnett intended to assert these counts against Mayor Willis and Grier in both their individual and official capacities.

It is well-settled, however, that suing an individual in his or her official capacity is akin to pleading a cause of action against the government entity that employs the individual. *See Kentucky v. Graham*, 473 U.S. 159, 167 n.4 (1985).  In other words, Dejarnett's claims against Mayor Willis and Grier in their official capacities are, in essence, direct claims against the City.  *Id.*  Here, Counts 1 through 3 of Dejarnett's complaint are already asserted against the City as part of the collective "Defendants."  As such, Dejarnett's official capacity claims against Mayor Willis and Grier are duplicative of the claims already asserted against the City in Counts 1 through 3 of the complaint and, therefore, are due to be DISMISSED.[9]

## B.    Title VII and § 1981 Claims

Count I of the complaint asserts claims against Defendants[10] for discriminatory

---

[9] The Court reaches this conclusion because Dejarnett is only seeking monetary relief from Mayor Willis and Grier in their official capacities.  If she had been seeking injunctive relief, the official capacity claims against them could proceed in addition to her claims against the City.  *See Will v. Mich. Dept. of State Police*, 491 U.S. 58 n. 10 (1989) (recognizing that a state official in his or her official capacity can be sued for injunctive relief under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State") (quoting *Kentucky*, 473 U.S. at 167 n.14)).

[10] Dejarnett asserts her Title VII claim against "Defendants" generally, which would, at first glance, appear to include Mayor Willis and Grier in their individual capacities, as all official capacity claims against them have been dismissed.  However, it is well-settled that only an

discipline and termination based on Dejarnett's race and color in violation of Title VII and § 1981.[11]   However, because Dejarnett failed to address her § 1981 claim in response to Defendants' summary judgment motion and, based on representations her counsel made at the September 19, 2011 pretrial hearing, it is clear that she is pursuing only her Title VII discrimination claim in Count I of the complaint.   Therefore, the Court concludes that Dejarnett has abandoned her § 1981 claim and that summary judgment is due to be GRANTED to Defendants on that claim.

Title VII prohibits discrimination in the terms, conditions, or privileges of one's employment based on race and color.  42 U.S.C. § 2000e-2(a)(1).  Because Dejarnett alleges that she was disciplined and terminated in a discriminatory manner based on her race and color, the Court will analyze this claim as a disparate treatment claim.

## 1.      Prima Facie Case

In cases like this one, where there is no direct evidence of discrimination,[12] a plaintiff

---

employer, not individuals, can be sued for discrimination under Title VII.  *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) ("Individual capacity suits under Title VII are . . . inappropriate.").  Thus, the Court will construe Dejarnett's Title VII claim as being asserted against the City only.

[11]   Title VII prohibits discrimination in the terms, conditions, or privileges of one's employment based on "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  Coverage under § 1981 includes the making and enforcing of employment contracts.  42 U.S.C. § 1981(b).

[12]   The parties do not dispute that Dejarnett has not presented any direct evidence of discrimination.  *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1987) (explaining that direct evidence is evidence, which if believed, proves the existence of the fact in issue without inference or presumption) (internal quotations and citations omitted).

16

may present circumstantial evidence from which an inference of intentional discrimination may be drawn. *See Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994). The first step in a disparate treatment claim based on a theory of "pretext" and supported by circumstantial evidence is for the plaintiff to establish a prima facie case, which creates a rebuttable presumption of unlawful discrimination. *Id.* A defendant must then rebut this presumption by articulating a legitimate, non-discriminatory reason for its action. *Id.* It is at this point that the burden shift backs to the plaintiff to establish that the non-discriminatory reason offered by the defendant is pretextual. *Id.* at 1313–14.

The elements of a plaintiff's prima facie disparate treatment case were set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under these directives, to set out a prima facie case of disparate treatment, Dejarnett must show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated or she was replaced by someone outside her protected class; and (4) she was qualified to do the job. *See Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006); *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ. ex. rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003). "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Sasser v. Ala. Dept. of Corrections*, 373 F. Supp. 2d 1276, 1285 (M.D. Ala. 2005) (internal quotations omitted). Moreover, "[t]he methods of presenting a prima facie

case are not fixed; they are flexible and depend to a large degree upon the employment situation." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

There is no dispute Dejarnett has met the first, second, and fourth elements of her prima facie case. The third element–whether Dejarnett was replaced by someone outside her protected class or treated less favorably than similarly situated employees outside her protected class–is the only element at issue here. The parties do not dispute that Dejarnett was not replaced by someone outside her protected class. Indeed, the evidence shows that Dejarnett's duties were redistributed to Stacye Carter, the Building Department secretary, after Dejarnett was terminated.

However, the parties do dispute whether Dejarnett was treated less favorably than a similarly situated employee outside of her protected class, namely, her white co-worker, Tonja Vreeland. "When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate 'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Burke-Fowler*, 447 F.3d at 1323 (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)). A proper comparator is an employee outside of the plaintiff's protected class who is similarly situated to the plaintiff in "all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1992). "When making that determination, we require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."

18

*Burke-Fowler*, 447 F.3d at 1323 (internal citations and quotations omitted).[13]  The "most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008).  Moreover, "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination" because "different supervisors may employ different disciplinary measures." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001).

In this case, Dejarnett points to her white co-worker, Tonja Vreeland ("Vreeland"), as a similarly situated comparator outside of her protected class who was treated more favorably than her.  Vreeland was hired as a Building Inspector/Code Enforcement Officer by the City in 2001.  (Doc. #18.)  In October 2008, Vreeland tested positive for marijuana following a random drug screen.  (Doc. #18.)  Under City policy, a first-time positive drug screen in violation of the City's Drug and Alcohol Policy warrants disciplinary action in the form of  a thirty day suspension without pay and the employee's completion of a drug and alcohol rehabilitation program.  Demotion may also result and termination is recommended for a second offense.  (Doc. #13, Ex. 1.)  Jo Glenn, who was the Mayor at the time, made all final decisions regarding employee discipline, and she determined that Vreeland's offense warranted a thirty day suspension without pay and completion of a drug and alcohol

---

[13]  The Eleventh Circuit has used the "nearly identical" test in cases involving terminations for misconduct/violation of work rules, such as those alleged here.  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1076, 1087 (11th Cir. 2004); *Rollins v. Ala. Cmty. Coll. Sys.*, 814 F. Supp. 2d 1250, 1268 (M.D. Ala. 2011).

rehabilitation program, which Vreeland completed.  (Doc. #18.)  Mayor Glenn also warned

Vreeland that a second offense would result in her termination.  (Doc. #18.)

The Court agrees with the City that Vreeland is not a sufficiently similar comparator

to Dejarnett to the extent the comparison is based on the discipline Vreeland received for

having a positive drug screen in violation of City policy.  The nature of these offenses are

starkly different.  Vreeland failed a random drug screen on a single occasion, while Dejarnett

was repeatedly abusive toward City customers and the City received multiple complaints as

a result.  Further, the discipline warranted by Vreeland and Dejarnett's offenses is different.

A first-time positive drug screen typically warrants a thirty day suspension without pay and

completion of a rehabilitation class, which Vreeland undisputedly received and completed.

Dejarnett's charged offenses, on the other hand, namely, abusive conduct and conduct

unbecoming an employee, warrant termination, even for a first offense, which Dejarnett

undisputedly received.  In short, Vreeland's failed random drug screen and Dejarnett's

abusive behavior toward customers are not "nearly identical" such that Vreeland could be

considered a sufficiently similar comparator to Dejarnett.

Moreover, while Vreeland and Dejarnett were both supervised by Grier during the

relevant time, it is undisputed that both individuals were disciplined by different Mayors,

both of whom possessed final decision making authority regarding employee discipline.

Differences in "treatment by different supervisors or decision makers can seldom be the basis

for a viable claim of discrimination."  *Silvera*, 244 F.3d at 1261 n.5; *Chapman v. AI

Transport*, 229 F.3d 1012, 1031 n.21 (11th Cir. 2000) ("Different decisionmakers are entitled

to be concerned about different things."). Thus, because Vreeland and Dejarnett were disciplined by different decision makers, their misconduct is not sufficiently comparable for purposes of establishing Dejarnett's prima facie case.

The Court is also satisfied that Vreeland is not a sufficiently similar comparator to Dejarnett to the extent the comparison is based on Vreeland's 2011 harassment offense. Vreeland was given a written counseling on September 12, 2011, several months after Dejarnett's termination, for violating Section 8.3 C.q of the City's Personnel Policies Manual. (Doc. #13, Ex. 18.) This section is for harassment, a group two offense, which is defined as "any form of harassment including sexual, racial, political, and/or religious of another employee or the public." (Doc. #13, Ex. 18.) This counseling resulted after Vreeland confronted another employee over a ring that was missing from her desk. (Doc. #13, Ex. 18.) Grier, who was Vreeland's supervisor at the time, signed the counseling and warned her that she would be placed on leave for another offense. (Doc. #13, Ex. 18.) Mayor Willis also had final decision-making authority with respect to employee discipline during this time. (Doc. #13, Ex. 18.)

While the parties essentially ignore Vreeland's 2011 harassment counseling in their briefing, likely because it occurred after Dejarnett's termination or they simply overlooked it, the Court does not believe that this counseling establishes Vreeland as an appropriate comparator. First, although Vreeland and Dejarnett were both charged with committing group two offenses (Vreeland was written up for harassment, while Dejarnett was terminated for abusive conduct and conduct unbecoming an employee), their respective offenses did not

21

involve "nearly identical" conduct.  The type of offenses categorized as group two offenses in the City's Personnel Policies Manual cover a wide array of offenses ranging from serious leave infractions, insubordination, and dishonesty to firearm possession, theft, and bribery. (Doc. #13, Ex. 1.)  Given the significant variation between the types of conduct that qualify as group two offenses under City policy, the Court cannot conclude that the offenses committed by Vreeland and Dejarnett are "nearly identical" for comparator purposes simply because they are both  categorized as group two offenses.  If that were the case, the Court would be permitted to compare offenses like serious leave infractions (an apple) with theft (an orange), which defies logic and precedent.  *See Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1999), *overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004) (noting that, while exact correlation is neither likely nor necessary, "the cases must be fair congeners.  In other words, apples should be compared to apples.").

Rather, the Court must look to the nature of the specific offenses and the discipline imposed.  Vreeland's harassment charge stemmed from a verbal confrontation she had with a fellow employee over a ring that went missing from her desk.  (Doc. #13, Ex. 18.) Dejarnett's charges, on the other hand, abusive conduct and conduct unbecoming an employee, arose after the City received multiple verbal and written complaints from customers and citizens of Wetumpka who were displeased with the abusive and hostile treatment they received from Dejarnett during the permit and inspection process.  The evidence does not indicate that Vreeland had prior similar incidents with her fellow

22

employees.  However, the City received complaints about Dejarnett from customers as early as 2008, with three being received within a two month period in the Spring of 2011.  In short, the Court cannot conclude that Vreeland's isolated incident with a fellow employee over a missing ring is "nearly identical" conduct to Dejarnett's repeated hostile and abusive treatment of outside customers and citizens of Wetumpka.

Other than Vreeland, who the Court determined is not a sufficient comparator, Dejarnett has presented the Court with no other evidence of comparators outside her protected class who engaged in conduct sufficiently similar to hers and who were not disciplined as severely.  Dejarnett points the Court to *King v. Piggly Wiggly Alabama Distribution Co., Inc.* for the proposition that a plaintiff can establish a prima facie case of discriminatory discipline by presenting either sufficient comparator evidence or evidence demonstrating that she did not actually violate the work rule with which she was charged. 2013 WL 839869, at *4 (N.D. Ala. Mar. 1, 2013) (citing *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989)).  While the Court agrees that this is indeed an alternative way for a plaintiff to establish a prima facie case, it does not salvage Dejarnett's claim.  Dejarnett's only evidence that she did not commit the offenses of abusive conduct and conduct unbecoming an employee are (1) her own opinion and (2) the June 1, 2011 memorandum from the City's attorney to Mayor Willis and Grier.  Dejarnett's subjective and uncorroborated belief as to whether she engaged in the conduct of which she was charged is irrelevant.  "The inquiry . . . centers on the employer's beliefs, not the employee's beliefs[.]"  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

23

Moreover, the City attorney's memorandum does not establish as fact that Dejarnett did not engage in the conduct with which she was charged. While the City attorney states in her memorandum that, based on the limited information provided to her, Dejarnett's conduct may not have risen to the level of a group two offense, but rather a group one offense subject to the City's progressive discipline policy, (Doc. #32, Ex. 5), Dejarnett cannot rely on these statements to prove that she did not commit the charged group two offenses, as they constitute inadmissible hearsay when used for that purpose. Moreover, even if these statements could be reduced to an admissible form at trial and, therefore, could be considered by the Court at summary judgment, they still do not raise a genuine dispute of fact that Dejarnett did not commit the charged offenses or that the City's belief that she did was unreasonable or in bad faith. Rather, these statements simply reflect the City attorney's opinion, which was based on limited information and no independent investigation of the facts.

Finally, even in the absence of sufficient comparator evidence or evidence that Dejarnett did not violate the work rules with which she was charged, Dejarnett could still establish a prima facie case of discrimination by presenting circumstantial evidence from which a reasonable trier of fact could infer intentional discrimination. But Dejarnett has failed to do that as well. Indeed, she has offered little other than her conclusory arguments that "it is clearly evident that the reasons stated for firing the Plaintiff were pretextual" and "it is more than clear the Plaintiff's race and/or color was a factor in her firing." (Doc. #32.) From what the Court can garner, the crux of Dejarnett's circumstantial evidence of

24

discrimination and/or pretext is a failure by the City to follow its personnel policies when disciplining her.  Specifically, Dejarnett points out that: (1)Vreeland was given written counselings but she was not prior to her termination; (2) she never received a performance evaluation or notice of the complaints against her; and, (3) the verbal counselings Mayor Willis and Grier claim to have given her and the complaints made against her were never properly documented in her personnel file, all of which she claims violated City policy.

First, the City's failure to provide Dejarnett with written counselings before her termination does not evidence that her termination was based on race or color.  Such an argument is premised on the idea that a written counseling was required under City policy before Dejarnett was terminated.  This would be true if Dejarnett had committed a group one offense.  However, Dejarnett was charged with committing two group two offenses– abusive conduct and conduct unbecoming an employee–which, under City policy, warrants termination upon the first offense.  In short, the City's progressive disciplinary policy did not apply to Dejarnett because, regardless of her own subjective beliefs as to categorization of her conduct, she was charged with group two offenses, not group one.  Thus, the City actually followed its policy when it terminated Dejarnett for these offenses, as opposed to providing her with progressive counselings.

Even if Dejarnett should have been given a written counseling and notice of the complaints made against her, or had any verbal counseling noted in her personnel file, the City's failure to follow its own policies, in and of itself, is probative, but not conclusive, evidence of discrimination. *See Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985)

("Departures from normal procedures may be suggestive of discrimination"); *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–56 (11th Cir. 1999) ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus.").  Here, the evidence as a whole does not create a factual dispute that the City's deviation from its policies in Dejarnett's case was done in a discriminatory manner.  While Dejarnett may point to the fact that Vreeland received a written counseling for a group two offense, while she did not, that course of action was within the City's discretion.  Indeed, the City's Personnel Policies Manual states that while a group two offense is normally grounds for immediate dismissal, "lesser disciplinary action may be taken if mitigating circumstances so warrant." (Doc. #13, Ex. 1.)  Thus, the City has discretion as to whether a group two offense is punishable by termination or less severe disciplinary action.  Further, while a change in performance evaluations from good to poor in close temporal proximity to an employee's termination, or inconsistent documentation of counselings in a personnel file, may suggest discrimination, the failure to give performance evaluations (whether good or bad) or to document counselings or complaints does not conclusively evidence discrimination when Dejarnett's conduct did not require that any prior warning be given before she was terminated and Dejarnett has offered no evidence that these policies were rigorously applied by the City to employees outside her protected class. *See Ritchie v. Indust. Steel, Inc.*, 426 Fed. App'x 867 (11th Cir. 2011) (holding that employer's failure to follow progressive discipline policy did not establish discrimination when management had discretion to follow the policy and the policy had not been consistently followed in all prior cases).

Second, as previously stated, Dejarnett's attempt to rely on the City attorney's June 1, 2011 memorandum is unavailing. It is clear from the memorandum that the City attorney was basing her recommendation that Dejarnett be disciplined in accordance with the progressive disciplinary policy on the "limited information" provided to her, and there is no evidence that the City attorney investigated the charges against Dejarnett. If anything, the City attorney's memorandum makes suggestions and recommendations, but does not, by itself, create a factual dispute that Dejarnett did not commit the offenses with which she was charged, or that her termination without prior counselings for the charged offenses was contrary to City policy.

The Court is also not persuaded that a reasonable jury could infer an intent to discriminate in this case based on Dejarnett's claims that she had to eat lunch at 11 a.m., that she was the only African-American working in the Building Department, and that Mayor Willis did not always speak to her. With respect to Dejarnett's 11 a.m. lunch hour, the evidence shows that the Permit Clerk, whether white or black, routinely went to lunch at 11 a.m, and Dejarnett never requested a different lunch hour. As to Mayor Willis not speaking to Dejarnett, the evidence shows that Mayor Willis did not speak to white employees as well. Moreover, Dejarnett testified that she never heard Mayor Willis or Grier make any racist statements or any other statements that would suggest they would base an employment decision on race or color. In fact, Dejarnett did not complain about discrimination until after her termination. Finally, while Dejarnett may have been the only full-time African-American employee in the Building Department, the evidence shows that an African-American female

27

worked in the Building Department part-time during Dejarnett's employment, that several African-Americans were employed in other City departments during Dejarnett's employment, and that several African-Americans were hired by the City under Mayor Willis during Dejarnett's employment.

Lastly, the subjective opinions of ousted City Council members that Dejarnett was discriminated against because of her race and color are not probative evidence of discrimination. These opinions are unsubstantiated, speculative, and certainly do not establish as fact that Mayor Willis, Grier, or the City had any discriminatory animus in terminating Dejarnett.

Having failed to establish valid comparators or to present sufficient circumstantial evidence from which a reasonable jury could conclude that the City acted with an intent to discriminate against Dejarnett based on her race or color, Dejarnett has failed to establish a prima facie case of discrimination. And, as the Court must note, even if Dejarnett had met her prima facie burden, her discrimination claim would still fail because she cannot demonstrate that the City's proffered legitimate, non-discriminatory for her termination–committing the group two offenses of abusive conduct and conducting unbecoming an employee–was pretext for a discriminatory motive. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996). A plaintiff is not allowed "to recast an employer's

proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer." *Chapman*, 229 F.3d at 1030 (alteration to original). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Id.*

In this case, Dejarnett has not established that the City's proffered reason for her termination is unworthy of credence or that a discriminatory reason motivated Grier's termination recommendation and Mayor Willis's approval and implementation of that recommendation. The question at the pretext stage is not whether the City's decision that Dejarnett had committed the charged group two offenses was correct, but whether the City believed in good faith that Dejarnett had committed those offenses. *See Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n. 4 (11th Cir. 1982) (recognizing that an employer's legitimate, non-discriminatory reason for termination, even if based on a mistaken but reasonable belief, will not subject an employer to liability if that belief is later proven to be incorrect); *Wigley v. R&D Maint. Servs., Inc.*, 2009 WL 2222706, at *9 (S.D. Ala. July 22, 2009) (noting that "it is true that an employer's good faith, but incorrect, belief that an employee violated a work rule (such as abandoning his job) can constitute a non-discriminatory reason for that employee's termination").

Dejarnett has pointed the Court to no evidence suggesting that the City's belief that Dejarnett had committed the charged group two offenses was made in bad faith or unreasonable. Both Mayor Willis and Grier testified that they received numerous verbal and

written complaints about Dejarnett's treatment of customers, as early as 2008. Even Dejarnett did not specifically refute that these complaints were made at the time she was terminated. She only claims that she was not given notice of them and their factual bases before her termination. And while Dejarnett now implies that the written complaints against her are not worthy of credence because they "suddenly appeared" after her termination and were never placed in her personnel file, the evidence does not support this contention. The City admits that complaints against Dejarnett were kept separately from her personnel file (which, if anything, is a likely benefit to Dejarnett), and there is no dispute that Dejarnett was given at least three of the written complaints after she requested them following her termination. While it would have been a better course of action to give Dejarnett a copy of every written complaint against her at the time it was made, the City's failure to do so, without more, does not prove that these complaints were concocted or fabricated, as Dejarnett suggests. Moreover, any failure by the City to follow its own policies, in and of itself, is not sufficient evidence of pretext, as Dejarnett has failed to create a genuine factual dispute that any such deviation occurred in a discriminatory manner or that the City lacked discretion to counsel Vreeland for committing a group two offense, while it terminated Dejarnett. *See Coleman v. Ala. State Univ.*, 904 F. Supp. 2d 1245, 1259 (M.D. Ala. 2012) ("An employer's failure to follow [its] policy . . . does not show pretext if management has discretion as to whether to follow the discipline policy." (internal quotations and citations omitted)); *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1378 (N.D. Ga. 2008) ("To establish pretext based on a failure to follow procedures, it must be remembered [that] a plaintiff must

30

show that the deviation from policy occurred in a discriminatory manner.") (internal quotations omitted) (internal quotations omitted).

With respect to the City attorney's memorandum, the City is not obligated to follow the suggestions of its counsel, and pretext is not established simply because the City reached a conclusion and followed a course of action different from that recommended by its attorney when there is insufficient evidence to suggest that such a decision was unreasonable or made in bad faith. In sum, given that the record reveals no other "weaknesses, implausibilities, inconsistencies, or contradictions" in the City's reason for Dejarnett's termination, *see Holland v. Gee*, 677 F.3d 1047, 1055–56 (11th Cir. 2012), the Court is satisfied that the City's belief that Dejarnett committed the charged group two offenses, whether right or wrong, was made in good faith.

Having failed to meet her burden, Dejarnett's Title VII claim cannot proceed. Therefore, the Court finds that summary judgment is due to be GRANTED to the City on Dejarnett's Title VII claim as alleged in Count I of the complaint.

## C.   Section 1983 Claims

Counts II and III of Dejarnett's complaint assert claims against all Defendants for denial of her equal protection and due process rights in violation of the Fourteenth Amendment. (Doc. #1.) Dejarnett's equal protection claim stems from Defendants' purported failure to follow the City's disciplinary procedures when terminating her, which, she claims, resulted in racial discrimination and a hostile work environment. (Doc. #32.) Dejarnett's due process claim stems from her termination, which she claims was both

31

procedurally and substantively flawed.  (Doc. #32.)

### 1.      Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment affords Dejarnett a right to be free from racial discrimination.  Indeed, the Eleventh Circuit has held that § 1983 may be used as a parallel remedy to Title VII for race discrimination which violates the Equal Protection clause of the Fourteenth Amendment.  The elements of such a claim are the same as the elements of a Title VII action.  *See Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).  Thus, in a § 1983 intentional discrimination suit based on circumstantial evidence, the plaintiff has the burden of establishing a prima facie case by a preponderance of the evidence.  *Russell v. City of Mobile*, 2013 WL 1567372, at *9 (N.D. Ala. Apr. 12, 2013) (citing *McDonnell Douglas*, 411 U.S. at 792).

As an initial matter, the Court must note that Dejarnett's equal protection claim, at least as pled in the complaint, was based, in part, on a racially hostile work environment theory.  (Doc. #1.)  However, based on Dejarnett's response in opposition to Defendants' summary judgment motion, it appears that she has abandoned that particular part of her equal protection claim.  Thus, summary judgment is due to be GRANTED to Defendants on Dejarnett's equal protection claim to the extent that claim is based on a hostile work environment theory.

The other basis for Dejarnett's equal protection claim is that she was treated differently than similarly situated white employees.  (Doc. #1).  From her response in opposition to Defendants' summary judgment motion, it appears that this difference is

premised on Defendants' failure to follow the City's Personnel Policies Manual when disciplining Dejarnett.  More specifically, Dejarnett complains that she was not warned or reprimanded during her employment with the City, while Vreeland, her white co-worker, was.  (Doc. #32.)

Mayor Willis and Grier contend that they are entitled to the defense of qualified immunity as to this claim.[14]  (Doc. #13.)  The doctrine of qualified immunity provides that municipal officials who are performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009).  To invoke qualified immunity, the official must first establish that he was acting within the scope of his discretionary authority when the alleged constitutional violation occurred.  *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010).  "'If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity.'" *Id.* (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004)).  This requires a plaintiff to prove that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation.  *Id.*  "'The

---

[14] "No qualified immunity exists for individuals sued under Title VII."  *Busby*, 931 F.2d at 772.  This is "because such claims must be made against the municipal officer in his *official* capacity, not in his individual capacity[,]" and such a suit, as previously discussed, is essentially a suit against the municipality itself.  *Id.*

judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Id.* (quoting *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009)).

The parties do not dispute that Mayor Willis and Grier were acting within their discretionary functions when Grier recommended Dejarnett's termination, and Mayor Willis approved and implemented this recommendation.  (Docs. #13, 32); *see Post v. City of Fort Lauderdale*, 7 F.3d 1552 (11th Cir. 1993) (finding that a city building inspector was entitled to qualified immunity); *Godby v. Montgomery Cnty. Bd. of Educ.*, 996 F. Supp. 1390, 1401 (M.D. Ala. 1999) ("[T]he determination that an officer was acting within his discretionary authority is quite a low hurdle to clear."); *Cheatwood v. City of Oxford*, 785 F. Supp. 926, 939 (N.D. Ala. 1992) (citing *Stewart v. Baldwin Cnty. Bd. of Educ.*, 908 F.2d 1499, 1503 (11th Cir. 1990)).  Therefore, the Court need only address whether Dejarnett has met her burden in proving that Mayor Willis and Grier violated her right to equal protection that was clearly established at the time of her termination.  This she has failed to do.

As the Court  noted above, when § 1983 is used as a parallel remedy for a violation of Title VII, the elements of the two causes of action are the same.  *See Underwood v. Perry Cnty. Comm'n*, 431 F.3d 788, 793 (11th Cir. 2005).  Consequently, Dejarnett's § 1983 claim fails for the same reasons as her Title VII claim.  Because Dejarnett cannot prove that Mayor Willis and Grier violated her clearly established equal protection rights, they are entitled to the defense of qualified immunity as to that claim.  Therefore, summary judgment is due to

be GRANTED to Mayor Willis and Grier on Dejarnett's § 1983 equal protection claim as alleged in Count II of the complaint.

To the extent Dejarnett is asserting her § 1983 claim against the City, a plaintiff cannot rely on a respondeat superior theory to hold a municipality liable for individual actions of its officers. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). "To impose liability on a municipal government under § 1983, the plaintiff must identify a municipal 'policy' or 'custom' causing the deprivation of federal rights." *Saul v. Pierce Cnty. Sch. Dist.*, 399 F.3d 1279, 1287 (11th Cir. 2005). The plaintiff must further demonstrate that the municipality's "deliberate conduct" was the "moving force" behind the injury alleged. *Russell v. City of Mobile*, 2013 WL 1567372, at *9 (S.D. Ala. Apr. 12, 2013) (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)). "'[T]o prevail on a § 1983 [equal protection] claim against a local government entity, a plaintiff must prove both that her harm was caused by a constitutional violation and that the government entity is responsible for that violation.'" *Id.* (quoting *Wyke v. Polk Cnty. Sch. Bd.*, 129 F.3d 560, 568 (11th Cir. 1997)) (internal citations omitted) (alteration to original).

Here, as with her equal protection claim against Mayor Willis and Grier, because Dejarnett cannot establish that her termination was caused by a violation of her equal protection rights or that the City's deliberate conduct was the moving force behind any such violation, summary judgment is due to be GRANTED to the City on Dejarnett's § 1983 equal protection claim as alleged in Count II of the complaint. *See City of Los Angeles v. Heller*, 475 U.S. 796 (1986) (holding that if an individual suffered no constitutional injury at the

35

hands of a police officer, then there can be no liability for the department).

### 2.      Due Process Claim

Under the Due Process Clause of the Fourteenth Amendment, to the extent a property interest exists in continued public employment, such interest cannot be taken without complying with the requirements of the Due Process Clause.  *See Mack v. Ala. Dep't of Human Res.*, 201 F. Supp. 2d 1196, 1210 (M.D. Ala. 2002) (citing *Bd. of Regents v. Roth*, 408 U.S. 564 (1972)).  In this case, it is undisputed that Dejarnett, as a classified employee, had a property interest in her continued employment with the City.  The only dispute is whether its taking complied with the requirements of due process.

As an initial matter, the Court notes that while Dejarnett's complaint asserts only a procedural due process claim, her summary judgment response appears to also present a substantive due process challenge.  (Docs. #1, 35.)  However, as Defendants correctly pointed out, public employment is no longer subject to substantive due process protection. *See McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994).  As such, summary judgment is due to be GRANTED to Defendants on Dejarnett's § 1983 due process claim to the extent she asserts that her substantive due process rights were violated.

That leaves the Court to address Dejarnett's claim that her procedural due process rights were violated by Defendants.  As with Dejarnett's equal protection claim, Mayor Willis and Grier argue that they are entitled to qualified immunity on this claim.  The Court has already determined, and the parties do not dispute, that Mayor Willis and Grier were acting within their discretionary authority when they terminated Dejarnett.  Thus, the

question before the Court is whether Dejarnett has met her burden in proving that Mayor Willis and Grier violated her clearly established right to procedural due process when terminating her. This, again, is a burden that Dejarnett has failed to meet.

Dejarnett's due process claim challenges both the adequacy of the notice of the charges against her and Mayor Willis and Grier's failure to follow the City's established policies in connection with her termination. Pre-deprivation due process entitles a tenured employee to "some kind of hearing" prior to termination. *Martin v. City of Dothan*, 2008 WL 541289, at *14 (M.D. Ala. Feb. 25, 2008) (internal quotations omitted) (citing *Cleveland v. Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545–47 (1985); *Harrison v. Wille*, 132 F.3d 679, 684 (11th Cir. 1998)). The employee must also be given notice and an opportunity to respond to the charges against her. *Cleveland*, 470 U.S. at 546. "No more than this is required, for it would disrupt the delicate balance which this requirement strikes between the employee's property interest and 'the government's interest in quickly removing an unsatisfactory employee.'" *Mack*, 201 F. Supp. 2d at 1211 (quoting *Cleveland*, 470 U.S. at 546).

Dejarnett does not deny that she was given notice. Rather, she challenges the adequacy of that notice. Specifically, Dejarnett argues that the charges against her, as identified in Mayor Willis's June 3, 2011 termination letter, were lacking in specificity regarding the misconduct alleged such that she could not meaningfully respond, and, therefore, she was denied the opportunity to effectively defendant herself against these charges. The Court does not agree. Pre-termination proceedings need not be elaborate.

37

*Cleveland*, 470 U.S.  at 545; *Black v. City of Auburn, Ala.*, 857 F. Supp. 1540, 1547 (M.D. Ala. 1994) ("The underpinnings of procedural due process are [simply] notice and a fair hearing.").  Mayor Willis's June 3, 2011 termination letter informed Dejarnett that the City had continued to receive unfavorable comments about her from the public and that her department head recommended she be terminated for violating the group two offenses of abusive conduct and conduct unbecoming an employee.  This letter further explained Dejarnett's pre-termination hearing rights, including the date, time, and location of the hearing, and the fact that she would be given a full and complete opportunity to respond to the charges against her.  While Dejarnett requested, but was not given, her personnel file prior to her termination hearing before Mayor Willis, there is no dispute that she was given a copy of at least three customer complaints against her prior to this hearing.  She also attended her termination hearing before Mayor Willis, accompanied by counsel, and had every opportunity to respond to the charges made against her.  Dejarnett and her attorney even submitted letters to Mayor Willis regarding her termination prior to her hearing with Mayor Willis, and the complaints made against her (which she and her counsel both had before the termination hearing) were discussed at length during the hearing with Mayor Willis.   In sum, the Court concludes that Dejarnett was provided with a sufficient pre-termination hearing, that she had ample opportunities to understand the charges against her, and that she had numerous opportunities to respond to those charges.

While Dejarnett suggests that the City's established policies were not followed to the letter when she was terminated (her termination was never taken up before the entire City

Council during a regular or special meeting, or in an informal setting, and the City Council never rendered a written decision as to Mayor Willis's affirmation of her termination), "noncompliance with personnel policies is not a per se denial of procedural due process." *Black*, 857 F. Supp. at 1547. Moreover, in this case, any such noncompliance did not prejudice Dejarnett to the point that she was deprived of her procedural due process rights because the notice and hearing she was given before Mayor Willis otherwise met the pre-deprivation due process requirements.

With respect to post-deprivation due process, *Parratt v. Taylor* holds that the Due Process Clause of the Fourteenth Amendment is not violated by unauthorized actions of municipal officials if the State makes available a meaningful post-deprivation remedy. 451 U.S. 527 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 330 (1986) (holding that the mere lack of due care by a state official is not enough to "deprive" an individual of life, liberty, or property under the Fourteenth Amendment, contrary to the conclusion reached in *Parratt*); *see also Hudson v. Palmer*, 468 U.S. 517, 533 (1983) (extending *Parratt* to include intentional unauthorized deprivation of property by state officials); *Lumpkin v. City of Lafayette*, 24 F. Supp. 2d 1259, 1265 (M.D. Ala. 1998). Dejarnett makes clear that she is challenging the adequacy of the notice given to her and Mayor Willis and Grier's failure to follow established City policies in connection with her termination. She is not challenging the constitutionality of the policies themselves. Such a claim falls squarely within the directives of *Parratt. See Lumpkin*, 24 F. Supp. 2d at 1265. As such, Dejarnett must demonstrate the absence of a meaningful state post-deprivation

remedy to move forward with her procedural due process claim.  *Id.*

The Eleventh Circuit has recognized "that Alabama courts review employment termination proceedings 'both to determine whether they are supported by substantial evidence and to see that the proceedings comport with procedural due process.'" *Id.* (quoting *Bell v. City of Demopolis*, 86 F.3d 191, 192 (11th Cir. 1996)).  Here, the Alabama courts were available to hear Dejarnett's claims that Mayor Willis and Grier failed to follow established City policies requiring notice and certain hearings before her termination.  *Id.* Based on the foregoing, because the State provides an adequate remedy for Dejarnett via recourse to its judicial system, she cannot show a post-deprivation procedural due process violation necessary to sustain her § 1983 claim.  Given that Dejarnett cannot prove that Mayor Willis and Grier violated her clearly established due process rights, they are entitled to the defense of qualified immunity as to that claim.  Therefore, summary judgment is due to be GRANTED to Mayor Willis and Grier on Dejarnett's § 1983 due process claim as alleged in Count III of the complaint.

Finally, to the extent Dejarnett asserts her due process claim against the City, the Court notes that she is not challenging the City's policies themselves; she is simply challenging the adequacy of the termination notice she received and the failure by Mayor Willis and Grier to follow City policy when terminating her.  In other words, Dejarnett has not challenged or identified a "municipal 'policy' or 'custom' causing the deprivation of federal rights."  *Saul*, 399 F.3d at 1287 (11th Cir. 2005).  Nor has she shown that the City's "deliberate conduct" was the "moving force" behind her alleged injury.  *See Russell*, 2013

WL 1567372 at *9.  Therefore, like her § 1983 equal protection claim, Dejarnett has failed to meet her burden as to her § 1983 due process claim against the City, and summary judgment is due to be GRANTED to the City on that claim.  *See Heller*, 475 U.S. at 799.

### D.    State Claim

Dejarnett also claims that the City is liable under state law for failure to train Mayor Willis and Grier in the appropriate personnel procedures for termination.  (Doc. #1.)  The Court has supplemental subject matter jurisdiction over this claim pursuant to 28 U.S.C. § 1367. Section 1367(c)(3) provides that a "district court may decline to exercise supplemental jurisdiction over a claim if . . . the district court has dismissed all claims over which it has original jurisdiction."   Because the federal claims over which this Court had original jurisdiction have been resolved against Dejarnett, the Court declines to exercise its supplemental jurisdiction over the state law claim and, instead, dismisses it without prejudice.  *See, e.g.,* 28 U.S.C. § 1367(c)(3); *Un. Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966).  This dismissal should not work to Dejarnett's disadvantage if she chooses to bring this claim in state court because the statute of limitations for this claim is tolled during the pendency of this action.  *See* 28 U.S.C. § 1367(d).

### VI.  CONCLUSION

Based on the foregoing, it is hereby ORDERED as follows:

1.    Defendants' Motion for Summary Judgment (Doc. # 13) is GRANTED as to Plaintiff's federal claims, and those claims (Counts I through III of the complaint) are DISMISSED WITH PREJUDICE;

2.      The remaining state law claim (Count IV of the complaint) is DISMISSED

WITHOUT PREJUDICE; and

3.      The trial of this case is CANCELLED.

A separate final judgment will be entered in accordance with this Memorandum

Opinion and Order.

DONE this the 4th day of October, 2013.

                              _____/s Mark E. Fuller_____
                              UNITED STATES DISTRICT JUDGE